***********
The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before the Deputy Commissioner and the briefs and arguments of the parties. The appealing party has not shown good grounds to receive further evidence or rehear the parties or their representatives. Following its review, the Full Commission AFFIRMS, with certain modifications, the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act. *Page 2 
2. Key Risk Insurance Company is the insurance carrier for said Employer-Defendant.
3. Employer regularly employs three or more employees and is bound by the provisions of the North Carolina Workers' Compensation Act. The employer-employee relationship existed between the employer and the employee on the 26th day of March 1997, the admitted date of the accident.
4. Employee-Plaintiff, Terri Tyer, sustained a compensable back injury which did occur by accident arising out of and in the course and scope of her employment on March 26, 1997 resulting in the payment of temporary total disability and authorized medical care.
5. The parties stipulate that Employee-Plaintiff, Terri Tyer, has an average weekly wage of $465.55, yielding a compensation rate of $310.38 which plaintiff is currently receiving.
6. The record includes the following:
 a. Stipulated Exhibit 1 consisting of 267 pages;
 b. The Opinion and Award for the Full Commission by Pamela T. Young, Chair filed July 8, 2008;
 c. The medical deposition taken of David C. Miller, M.D. of Carolina Regional Orthopaedics on September 7, 2007 and attached exhibits;
 d. The deposition of Terri Tyer taken on June 19, 2007 and attached exhibits;
 e. The depositions of Dr. David Miller, Dr. Cynthia Lopez, Dr. Rebecca Potter, Valerie Hanna and Stephen Carpenter, taken after the hearing on February 9, 2010.
 ***********
Based upon the competent evidence of record, the Full Commission makes the following: *Page 3 
 FINDINGS OF FACT
1. Plaintiff is 48 years old, with a high school diploma, and has been employed with Defendant from approximately September 1993 until 1998. While employed with Defendant, she worked as a boat detailer, in the mold department building molds, and then in Service and Warranty.
2. On March 26, 1997, Plaintiff sustained a compensable injury to her back. Defendant admitted the compensability of Plaintiff's claim in a Form 60 filed September 26, 1997. After the compensable injury, Plaintiff began a long course of medical treatment for chronic low back pain and leg pain with a number of physicians. Plaintiff's prior medical treatment is summarized in the Full Commission Opinion and Award of July 8, 2008, which is incorporated herein by reference.
3. David C. Miller, M.D., an orthopedic surgeon, is Plaintiff's authorized treating physician, and has been involved with Plaintiff's treatment and care related to her accepted workers compensation claim since an initial evaluation on September 26, 2001. Plaintiff underwent surgery by Dr. Miller on March 27, 2002, wherein he performed an authorized lumbar fusion at L3-4, L4-5 and L5-S1. Following the fusion, Plaintiff underwent another authorized operation on March 26, 2003 by Dr. Miller to correct a pseudoarthrosis, or a lack of fusion from her first operation.
4. As a result of Dr. Miller's second operation, Plaintiff experienced some improvement in her back pain and leg pain, but over the ensuing months and years, Plaintiff developed pain over the sacroiliac joint region. Dr. Miller performed a series of authorized sacroiliac joint injections. The injections provided only temporary relief of Plaintiff's symptoms. *Page 4 
5. On December 1, 2004, Dr. Miller assigned Plaintiff permanent work restrictions of sedentary work of no sitting greater than thirty minutes without a break, as well as no walking for more than thirty minutes without a break. He determined that Plaintiff may require the use of assistive devices. He assigned a 30% permanent partial impairment [hereinafter "PPD"] rating to Plaintiff's back and released her to attempt sedentary work for an eight-hour day, with the understanding that Plaintiff may not tolerate that many hours.
6. On March 6, 2006, Plaintiff presented to Dr. Miller for an authorized consultation. Dr. Miller further limited Plaintiff's work restrictions from eight hours a day to part-time, four hours a day, sedentary work, allowing Plaintiff to rotate sitting and standing during the four hour-period.
7. By August 9, 2006, Plaintiff was ready to pursue another recommended surgical intervention to seek pain relief. Dr. Miller released Plaintiff completely from work until after surgery, as his office sought pre-approval through Workers' Compensation for the left-sided sacroiliac joint fusion surgery. Dr. Miller testified that Plaintiff's total disability as of the August 9, 2006 visit was related to Plaintiff's workers' compensation claim for which he had provided treatment. The authorized left sacroiliac joint fusion was performed on June 25, 2007.
8. On November 21, 2007, Dr. Miller assigned a 5% PPD rating to the spine related to the left sacroiliac [hereinafter "SI"] joint fusion. The 5% PPD rating was in addition to the previous 30% PPD rating that had been given to the spine on December 1, 2004.
9. Plaintiff was to undergo a right SI joint fusion on December 18, 2007, but the surgery had to be delayed because of complications related to Plaintiff's seizure disorder. Plaintiff did undergo the right SI joint fusion on February 18, 2008. Because Plaintiff had *Page 5 
burning in her thigh and over the lateral cutaneous nerve of the thigh following the procedure, Dr. Miller had to go back and re-explore that particular area.
10. A Functional Capacity Evaluation [hereinafter "FCE"] was performed on October 8, 2008. The FCE indicated that Plaintiff "is capable of sustaining the sedentary level of work for an 8-hour day. Able to complete the evaluation." On November 17, 2008, Plaintiff reported to Dr. Miller that after the FCE she experienced an increase in her back pain. Dr. Miller determined Plaintiff to be at maximum medical improvement [hereinafter "MMI"] and assigned an additional 5% PPD to the spine for the right SI fusion, in addition to the other two ratings. Dr. Miller restricted Plaintiff to permanent sedentary work at an eight-hour day, pursuant to the FCE. Since November of 2008, Plaintiff treats with Dr. Miller every three months, at which time Dr. Miller refills her medication and gives Plaintiff injections in both sides.
11. Plaintiff testified at the February of 2010 hearing before the Deputy Commissioner that for the period of February 20, 2009 through February 6, 2010, Plaintiff conducted job search on her own and maintained a log of jobs for which she applied. During this same period of time, surveillance reports offered by Defendant dated December 7, 2009, February 1, 2010 and February 2, 2010 show Plaintiff can drive to various locations such as Trade Wilco, Dollar Tree and Walmart. It also showed Plaintiff could ambulate with a cane.
12. Plaintiff remained on these sedentary work restrictions until January 13, 2010. A return to work note signed by Dr. Miller on January 13, 2010 says "permanent sedentary work Ø sitting/standing longer than 30 mintes (sic) without 10 min break." On February 10, 2010, Dr. Miller's office received a telephone call from Plaintiff, at which time she described an increase in her pain after being in court for the workers' compensation hearing. Dr. Miller's office called in a cortisone package for six days. *Page 6 
13. On March 17, 2010, Plaintiff was at Dr. Miller's office and reported having more severe back pain and "was unable to sit and bear weight on her buttocks or even stand." A return to work note was completed and the boxes marked "no work" and "no school" were checked. Plaintiff was next seen on April 14, 2010, at which time she did not believe she was yet able to go back to work. A similar return to work note was issued, indicating "no work" and "no school."
14. Dr. Miller testified at his deposition that while plaintiff has been temporarily taken out of work and vocational rehabilitation activities as a result of the reported increase in pain in March and April 2010, she is not considered to be permanently and totally disabled at this time. Dr. Miller described the current snapshot of her status as a "temporary" no work status, and that he anticipated treating her again approximately three months.
15. Plaintiff retained Stephen Carpenter as a vocational expert. He is the owner of Carpenter Rehabilitation and has been self-employed since 1989. Mr. Carpenter testified at his deposition that in preparing a vocational report he (a) obtains medical records, psychological records, along with other pertinent records; (b) contacts the injured work to schedule a meeting with said person; (c) completes the interview, along with vocational testing session; and (d) then reviews the records to in conjunction with rehabilitation, vocational research activities to generate a report.
16. Mr. Carpenter met with Plaintiff on September 28, 2009. During this meeting, the two discussed Plaintiff's education, work history, medical history regarding her impairments and her understanding of her residual functional capacity, and social history. Following the review of the records and consultation with Plaintiff, Mr. Carpenter performed the following vocational tests: (a) Wide Range Achievement Test IV; (b) Mental Status Examination, including the Mini-Mental *Page 7 
State Examination; (c) Learning Efficiency Test II; (d) Minnesota Clerical Test; (e) Perdue Pegboard Test; (f) JAMAR Hydraulic Hand Dynamometer and Pinch Gauge; and (g) Valpar Component Work Sample Number 201.
17. Mr. Carpenter opined at his deposition that Plaintiff does not qualify for competitive work at any exertional level, even if it was sedentary and included a flexible sit/stand schedule; that Plaintiff was not employable in any job at any functional level on a competitive basis eight hours per day 40 hours per week; that Plaintiff is totally disabled from a vocational standpoint, and she is not capable of the full range of sedentary work; that Plaintiff
 . . . would have a great deal of difficulty obtaining employment and if she did obtain some sort of employment she would have a great deal of difficulty maintaining that employment because of work pace, her work performance, her work attendance would probably not meet acceptable employer standards.
In his opinion it is futile for Plaintiff to attempt to look for competitive employment at the light or sedentary level.
18. Mr. Carpenter further testified that his interpretation of Dr. Miller's January 13, 2010 restrictions of permanent sedentary work, with no sitting or standing longer than 30 minutes without a 10-minute break would mean that Plaintiff would work for thirty (30) minutes, either standing or sitting, and then taking a ten (10) minute break, followed by another thirty (30) minutes either standing or sitting, and then taking a ten (10) minute break.
19. Mr. Carpenter opined that the January 13, 2010 restrictions mean that Plaintiff:
 . . . does not meet the Department of Labor classification of a full range of sedentary work. She would be unable to work on a consistent basis for an eight hour work shift. She would not meet the attendance demands or the work pace or performance demands of sedentary based on having to take a 10-minute break every 30 minutes of activity. *Page 8 
20. Mr. Carpenter opined that if an employee with sedentary work restrictions experienced periodic episodes which aggravated and exacerbated an underlying back condition causing an employee to miss one or two days of a 5-day week or two full days of a 2-week period, and that occurred every 2-3 months, then Plaintiff or that employee would not meet the attendance requirements or the performance requirements of full-time work. Mr. Carpenter opined that such an employee "would have significant problems in maintaining employment, full-time employment."
21. Ms. Valerie Hanna is a vocational case manager employed by VocMed for almost three (3) years. Ms. Hanna became involved in the rehabilitation of Plaintiff around January 2010 to locate suitable employment. Ms. Hanna's role is to aide Plaintiff in looking for jobs within her restriction level, which was sedentary work only, and within her education level, which was a high school diploma. Ms. Hanna initially met with Plaintiff to obtain her work history, educational history, and her medical treatment history.
22. Ms. Hanna testified at her deposition that she assisted Plaintiff in a job search from January 2010 through March 17, 2010, at which time Dr. Miller's note precluded Plaintiff from school and work activities. During this time period, Ms. Hanna testified that no employer had offered Plaintiff suitable employment.
23. Along with the job search, Ms. Hanna also recommended computer skills training and job-seeking skills training. As of February 2010, Plaintiff was working on her Career Readiness Certificate. Ms. Hanna testified that she was not able to locate computer classes focused specifically on computer skills, as none were available in the area.
24. Ms. Hanna opined that it was beneficial for Plaintiff to engage in job search and attempt to locate employment. She also confirmed that in her opinion, to a reasonable degree of *Page 9 
certainty as an expert in her field, it would not be futile to continue vocational rehabilitation once the "no work" status is lifted. Ms. Hanna believes, assuming Dr. Miller lifts the "no work no school" restrictions, it would be appropriate for Plaintiff to continue vocational rehabilitation.
25. The Full Commission finds that Plaintiff is presently under a "no work" and "no school" order from her treating physician, Dr. Miller. The Full Commission further finds, based upon the greater weight of the evidence of record, including the deposition testimony of Dr. Miller, that Plaintiff has not established that she is permanently and totally disabled.
26. The Full Commission finds, based upon the greater weight of the evidence of record, including the deposition of Valerie Hanna, that until Dr. Miller's restrictions are lifted, Plaintiff's vocational rehabilitation should be suspended until further Order of the Commission.
27. In addition to her compensable back condition, Plaintiff has a history of seizures, for which Tegretol has been prescribed. Dr. Miller has prescribed name brand prescriptions of Ambien, Flexeril, Lorcet, Mobic, and Neurontin.
28. Dr. Cynthia Lopez is a Neurologist with a sub-specialty in EMG and neuromuscular disease. Dr. Lopez is not an authorized treating physician for Plaintiff's workers' compensation claim. Dr. Lopez first saw Plaintiff on September 30, 2003 as a referral from Dr. Miller. It was not a neurological consultation; this was for electromyography.
29. Plaintiff returned to Dr. Lopez on March 5, 2004. She was seen by Dr. Lopez for a focal seizure by history. Plaintiff had been seen at East Carolina Neurology before, so she asked for their records to confirm the diagnosis was indeed focal seizures. Dr. Lopez's office never received the records from East Carolina Neurology.
30. Plaintiff returned to Dr. Lopez six weeks later. Dr. Lopez reviewed her past medical history and the fact that she had had remote seizures with recurrent left-sided focal *Page 10 
seizures following a myelogram. She had been on long-term Tegretol, but the dose had been increased to 200 mg three times a day, and Plaintiff had done well without any further seizures. The MRI of the brain returned and did not show a focal lesion as the cause of her seizures, but it did show a Chiari I malformation and a little maxillary sinus retention cyst. Dr. Lopez was not sure if the Chiari malformation could be worsened during a lumbar puncture for a myelogram, and whether that could precipitate seizures.
31. Dr. Lopez next treated Plaintiff on December 20, 2007, for a repeat neurological consultation. Plaintiff was having some involuntary movements of her left thumb, which Dr. Lopez noted may be a manifestation of a focal seizure. Plaintiff reported that she had been decreasing her Neurontin dose, which she was taking for pain. Dr. Lopez noted Neurontin was also an anticonvulsant, so decreasing the dose of just that medicine might have precipitated focal seizures for her. Because Plaintiff was having new involuntary episodes in her thumb, Dr. Lopez suggested Plaintiff go back on the higher dose of Neurontin for both the pain and for potential focal seizures.
32. Plaintiff continued to treat with Dr. Lopez. On October 21, 2009, Plaintiff's medications included Tegretol, Lorcet, Mobic, Flexeril, Ambien, Neurontin, Flonase, and Pravastatin. Dr. Lopez noted that Plaintiff had been seizure-free for almost two years. Plaintiff talked to Dr. Lopez about switching her medicines to generics.
33. Dr. Lopez testified at her deposition that she discouraged Plaintiff from switching her medications to generics. Speaking specifically to Tegretol, Dr. Lopez stated that "it can be very variable if you use generic" and that "brand seizure medications are superior to generic." Dr. Lopez further stated that Neurontin and Flexeril could have an interaction with Tegretol that would discourage the use of generics. *Page 11 
34. Dr. Lopez opined that other than cost, there would be no medical reason for a physician to switch a patient's prescriptions from brand name to a brand generic substitute if a patient did not desire to change.
35. Dr. Lopez stated that if Dr. Miller desired to continue and Plaintiff desired to continue on the current regiment of brand name medications, then she would not object to it. Dr. Lopez testified that any change in medications, either starting a new medication or taking away a medication, should occur one at a time to properly diagnosis any problems from the changed medication.
36. Dr. Rebecca Potter is employed as a clinical pharmacist by Modern Medical, a third-party administrator for workers' compensation benefits. Dr. Potter performs drug utilization reviews. As an employee for Modern Medical, she completes independent pharmaceutical evaluations and gives drug information to clients and coworkers.
37. Dr. Potter reviewed five (5) brand name medications taken by Plaintiff. These were Ambien, Flexeril, Lorcet, Mobic, and Neurontin.
38. According to Dr. Potter's report, there is a distinction between "generic" and "authorized generic" medications. Dr. Potter stated that by definition "authorized generics" have the identical active and inactive ingredients as brand name medications.
39. Dr. Potter opined in her report, submitted as evidence at the hearing before the Deputy Commissioner, that Plaintiff's medications could be switched from name brand medications to authorized generic medications with no adverse health effects. Dr. Potter acknowledged that all name brand medications do not have authorized generic substitutes, that she did not know anything about Plaintiff's seizure condition, and that had she not reviewed any records in connection with Plaintiff's seizure condition. *Page 12 
40. Pursuant to a discussion between Dr. Miller and Plaintiff at the November 2, 2009 medical appointment, Dr. Miller prepared a letter dated December 7, 2009. The letter, submitted as evidence at the hearing before the Deputy Commissioner, states that Plaintiff has been on a medical regimen for many years without significant changes, that the medications have no generic substitutes, and that Plaintiff has had reactions "in the past when she has had generic options." Dr. Miller opined that none of Plaintiff's medications should be changed to generic equivalents, but that Plaintiff should "remain with these proprietary medications," which are the following medications: Lorcet, Mobic, Ambien, Flexeril, and Neurontin.
41. The Full Commission finds, based upon the greater weight of the evidence of record, including the deposition testimonies of Dr. Miller and Dr. Lopez, that Plaintiff's medications should only be changed from the current proprietary medications to authorized generics with the consent of the treating physicians.
 ***********
Based upon the competent evidence of record, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. "Disability" is defined as "incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or any other employment." N.C. Gen. Stat. § 97-2(9). It is well-settled that "disability" must be demonstrated in one of four ways: (1) by the production of medical evidence that the employee is physically or mentally, as a consequence of the work-related injury, incapable of work in any employment; (2) by production of evidence that the employee is capable of some work, but has after a reasonable effort been unsuccessful in his efforts to obtain employment; (3) by production of evidence that the employee is capable of some work but that it would be futile because of preexisting conditions, *Page 13 i.e., age, inexperience, lack of education, to seek other employment; or (4) by the production of evidence that the employee has obtained other employment at a wage less than that earned prior to the injury. Russell v. Lowes Prod. Distrib.,108 N.C. App. 762, 425 S.E.2d 454 (1993).
2. Although a rebuttable presumption of continuing disability has been created by the prior award of compensation in this matter, there is no presumption of permanent and total disability. Accordingly, plaintiff has the burden of proving that her disability is permanent and total in this claim. Based on the testimony of Dr. Miller and his March 17, 2010 note taking Plaintiff out of work, and Plaintiffs demonstrated ability to drive, the Full Commission concludes that Plaintiff has failed to established that she is permanently and totally disabled.
3. Vocational rehabilitation services are suspended until further Order of the Industrial Commission. N.C. Gen. Stat. § 97-25.
4. Defendants shall continue providing medical treatment for Plaintiff's back injury for so long as such treatment is reasonable and necessary to effect a cure or provide relief. N.C. Gen. Stat. § 97-25.
5. Defendants shall continue to authorize prescriptions as prescribed by Dr. David Miller, Plaintiff's authorized treating physician. N.C. Gen. Stat. § 97-25. Defendants may only provide Plaintiff with authorized generic medications if Dr. Miller prescribes authorized generic medications. N.C. Gen. Stat. § 97-25.
6. Defendants shall reimburse Plaintiff for any previous job-related travel with round trip mileage of 20 miles or more upon provision of appropriate documentation by Plaintiff. N.C. Gen. Stat. § 97-25.
7. Plaintiff's request for an award of attorneys' fees under N.C. Gen. Stat. § 97-88.1 is denied. *Page 14 
 ***********
Based upon the foregoing Stipulations, Findings of Fact, and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Defendants SHALL continue to pay weekly temporary total disability compensation to Plaintiff at the rate of $310.38 per week until further Order of the Industrial Commission.
2. Vocational rehabilitation is suspended until further Order of the Industrial Commission.
3. Defendants shall continue to pay for all reasonably related medical expenses incurred or to be incurred by Plaintiff for treatment related to her back injury which tends to effect a cure or provide relief, including Defendants shall authorize and pay for Dr. David Miller to provide further treatment for Plaintiff's compensable back injury, including but not limited to consultations, diagnostic testing, referrals, injections, and brand name prescriptions to the extent Dr. Miller continues to prescribe brand name medications. Dr. Miller is assigned as Plaintiff's authorized treating physician.
4. Defendants shall pay mileage reimbursement at the applicable rate for Plaintiff's travel over 20 miles related to her previous vocational rehabilitation efforts.
5. An attorneys' fee is approved for Plaintiff's counsel in the amount of 25% of the disability benefits to be paid to Plaintiff from the date of this Opinion and Award until further order of the Commission.
This the __ day of April 2011. *Page 15 
 S/___________________ PAMELA T. YOUNG CHAIR
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/___________________ STACI T. MEYER COMMISSIONER *Page 1